EXHIBIT A

## DECLARATION IN SUPPORT OF VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

I, Michael Carnucci, Special Agent with the Drug Enforcement Administration ("DEA") do hereby declare:

### Introduction and Agent Background

1.  I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2.  I have been employed as a Special Agent for the DEA since 2016.  For the past eight years, I have gained experience and undergone training in the investigation of narcotics trafficking organizations.  During the course of my law enforcement experience, specifically DEA, which specializes in narcotics investigations, I have participated in several complex domestic investigations involving drug trafficking organizations dealing in cocaine, methamphetamine, heroin, marijuana, and other controlled substances.  Prior to my employment with the DEA, I was a police officer with the National Security Agency for four years. Based on my training, experience, and participation in controlled substance investigations, I am familiar with the methods of operation of drug traffickers. I am familiar with and have used normal methods of investigation, including, but not limited to, visual surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the utilization of undercover agents and the use of court-authorized wire intercepts. I am also familiar with federal criminal laws, particularly those laws relating to narcotics.  I am part of an experienced team of narcotics investigators that have participated in numerous drug trafficking investigations utilizing various investigative techniques.

3. During my time as a law enforcement officer, I have participated in multiple investigations involving drug trafficking to include the use of confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, the execution of search and seizure warrants, and the recovery of substantial quantities of narcotics.

4. As a result of my participation in numerous investigations involving drug trafficking, I have become familiar with the following investigative tools and techniques: the use of confidential informants; undercover transactions; physical and electronic surveillance; telephone toll analysis; investigative interviews; the execution of search and seizure warrants; and the recovery of drugs, drug proceeds, and drug paraphernalia. I have reviewed audio conversations as well as documents and other records relating to drug trafficking.

5. Through my training and prior experience with drug trafficking investigations and arrests, I am familiar with the actions, traits, habits, and terminology utilized by drug traffickers. I am familiar with the ways in which drug traffickers conduct their business, including methods of importing and distributing drug, money laundering, the use of cellular telephones and the internet to facilitate illegal activities, and the use of numerical codes and code words to conduct drug transactions.

6. Based on my training, knowledge, and experience, I know the following:

   a. Drug trafficking is an ongoing and recurring criminal activity. In contrast to crimes against persons, which tend to be discrete offenses, drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

   b. Drug traffickers commonly compartmentalize members of their organization into discrete "cells" with specific members, responsibilities, and/or geographical territories assigned to each cell. In that regard, I know that members of one cell commonly are

provided with information only about their specific cell's criminal activities, thus limiting the information about the overall organization and ultimately frustrating law enforcement efforts to dismantle the larger organization.

   c. Cellular telephones are an indispensable tool of the drug trafficking trade. Drug traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with co-conspirators. In addition, drug traffickers will often change their cellular telephone numbers following the arrest of a member of their drug trafficking organization, or at random times in order to frustrate law enforcement efforts.

   d. Drug traffickers often place nominal control and ownership of cellular telephones in names other than their own to avoid detection of those telephones by government agencies. Even though these telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of these telephones, exercising dominion and control over them.

   e. Individuals who engage in drug trafficking often use cellular telephones to communicate with co-conspirators via phone calls and text messages.

   f. Drug traffickers use uninhabitable locations (for example, vacant dwellings, storage lockers, garages, etc.), often under another person's name, as "stash locations" for the storage of drugs and currency, as well as to process and package drugs for distribution. Your Affiant also knows that houses and/or apartments within neighborhoods are often utilized as stash houses.

   g. Drug traffickers often maintain financial records and financial instruments related to their CDS transactions and the profits derived from those transactions including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks,

bonds, jewelry, precious metals, and bank and real estate records. Such documents are frequently maintained where the traffickers have ready access to them, including in their residences and vehicles. Drug traffickers frequently maintain books, records, and other documents that identify and contain the names, addresses, and/or telephone or pager numbers of associates in their drug trafficking or money laundering activities, including, but not limited to address books, telephone books, rolodexes, and notes reflecting telephone and pager numbers, documents or other records relating to state court proceedings involving co-conspirators, and audiotape recordings of conversations, including those made over telephone answering machines.

      h.     Drug traffickers commonly use vehicles to move quantities of drugs and currency to other locations for storage and further distribution and use, and often rent vehicles instead of using their own to prevent their own vehicles from being seized by law enforcement. Drug traffickers often have unexplained wealth, assets, and a high standard of living with no reported income, which is probative evidence of crimes involving drug trafficking.

      i.     Drug traffickers often swap vehicles with other conspirators, use vehicles with dealer/interchangeable registration plates, use rental vehicles, use multiple vehicles, and use vehicles registered in names other than their own in order to frustrate law enforcement efforts.

## Purpose of This Declaration

7.     This Declaration is submitted in support of the Verified Complaint for Forfeiture *In Rem* of the $56,960 in U.S. Currency (Asset ID No. 25-DEA-721434) seized on or about June 16, 2025, from 100 Harborview Drive, Unit 209, Baltimore, Maryland (the "Defendant Property").

8.     I submit that there are sufficient facts to support a reasonable belief that the Defendant Property constitutes: (1) "things of value" furnished or intended to be furnished in

exchange for a controlled substance in violation of the Controlled Substances Act; or (2) proceeds traceable to such an exchange and thus is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## Summary of the Investigation

9. During the month of October 2024, investigators with DEA Baltimore Group 54 began an investigation into the KIRK GROSS ("GROSS") Drug Trafficking Organization (the "GROSS DTO"). In August 2024, investigators received information from the Baltimore City Police Department ("BPD") via an anonymous source that GROSS, Target Subject #1, is currently involved in narcotics distribution throughout the Baltimore, Maryland. The information provided in the anonymous tip also stated that in the recent past GROSS' vehicle was damaged in a shooting while the vehicle contained firearms and narcotics. Investigators were able to verify that the cellular telephone number that called in the anonymous tip was physically close to the shooting incident when it occurred. Per the information provided from the anonymous tip, GROSS is also involved in running several drug shops in Baltimore.

10. Your affiant and members of the investigative team were able to confirm that there was a shooting involving GROSS and his vehicle in the month described by the anonymous source. The anonymous tip also indicated that the shooting was an attempt on GROSS' life was in retaliation for GROSS' involvement in coordinating several murders and attempted murders. GROSS was arrested in 2019 as a result of an HSI Baltimore operation during which agents seized 1.4 kilograms of a fentanyl/heroin mix, 1.1 kilograms of cocaine, multiple firearms and approximately $340,000 from GROSS' residences and vehicle. On July 23, 2020, GROSS was charged with Conspiracy to Distribute and Possess with Intent to Distribute Fentanyl, Heroin, and Cocaine, in violation of 21 U.S.C. § 846 (Count One), Possession with Intent to Distribute

Fentanyl, Heroin, and Cocaine, in violation of 21 U.S.C. § 841 (Count Two), and Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1) (Count Three).  On August 12, 2020, GROSS pleaded guilty to all three counts.  See *United States v. Kirk Gross*, Crim. Case No. 20-cr-219-SAG.  GROSS was sentenced to 60 months on all three counts to run concurrently.  *Id.*, Dkt. No. 17.  GROSS is currently under supervised release by the U.S. Probation Office.

      11.      Additionally, last year, investigators received information from a Confidential Source[1] (hereinafter "CS#1") who had information about the GROSS DTO. CS#1 advised investigators that he/she is familiar with GROSS and stated that GROSS has been distributing narcotics for the past several years.  Investigators provided CS#1 with a photograph of GROSS and CS#1 confirmed that the photo of GROSS depicts the individual CS#1 was referring to as GROSS.

      12.      CS#1 told your affiant that he/she had recently spoken with a close associate of GROSS and was advised that GROSS is currently "making a lot of money."  CS#1 told investigators that he/she believes that GROSS is making money from narcotics distribution. CS#1 also told investigators that he/she spoke with several individuals in a specific area of Baltimore in which GROSS is reportedly running a narcotics distribution shop, and CS#1 advised that he/she was told that GROSS is currently distributing narcotics and making a lot of money doing so.

---

[1] The Confidential Source (CS) is a documented DEA confidential source. The CS is cooperating for monetary compensation and the CS was convicted in the 1990s of conspiracy to distribute heroin and fentanyl. The CS's information has been shown to be reliable in this investigation and the information provided by the CS pertaining to this investigation has been corroborated. No information has been derived by DEA that would indicate that CS is providing false information in any manner.

13.     Investigators gathered information from the Maryland Department of Labor & Licensing, which showed that GROSS has not had any reported wage earnings since the first quarter of 2023, which only totaled $678.16, and in 2022, GROSS reported wage earnings of $10,518.13.

14.     Since GROSS does not appear to have a legitimate source of income or employment, investigators believe that GROSS is making money primarily, if not solely, from narcotics distribution.

15.     CS#1 also confirmed the information the anonymous source had previously provided, namely that GROSS was involved in a shooting in the recent past during which his vehicle was repeatedly shot, and that this shooting likely occurred because a group of individuals wanted to take over GROSS' narcotics distribution territory. CS#1 told investigators that GROSS is always armed due to the attempt on his life, and that GROSS wanted to offload narcotics that he usually stored at one of his own residences after the shooting.

16.     Additionally, on March 5, 2025, your affiant and members of the investigative team observed GROSS exit from a white Nissan Rogue bearing New Jersey registration E59-SNE (rented by GROSS) and enter a Subway restaurant in Owings Mills, Maryland. An investigator entered the Subway as well and observed GROSS talking with an unidentified person. The investigator sat down at a different table and was able to overhear GROSS and the unidentified person engaging in narcotics-related conversation: GROSS and the unidentified person were discussing narcotics prices and the unidentified person told GROSS that he was expecting something to arrive sometime next week. Based on training and experience, investigators believe that GROSS and the unidentified person were meeting to arrange a future narcotics transaction face-to-face.

17. During the month of April 2025, investigators met with a Baltimore City Police Department Confidential Source[2] ("CS#2") who had information pertaining to the GROSS DTO. CS#2 told investigators that he/she is aware that GROSS is currently distributing cocaine and marijuana in the Park Heights neighborhood of Baltimore, MD.

18. Investigators also showed CS#2 a picture of an older unidentified black male ("Target Subject #2"), who investigators have observed on surveillance with GROSS on several occasions, and CS#2 identified the individual in the picture and stated the individual distributes cocaine on behalf of GROSS. CS#2 provided investigators with a cellular telephone number for Target Subject #2 and stated that anytime Target Subject #2 is with GROSS, Target Subject #2 is assisting GROSS in packaging narcotics and preparing them for distribution.

19. CS#2 stated that Target Subject #2 is lives in a specific area of Baltimore that investigators have observed both Target Subject #2 and GROSS at a residence in that area on several occasions. CS#2 also stated that he/she has previously purchased cocaine from Target Subject #2 and believes that Target Subject #2 keeps firearms and narcotics at his residence.

20. As set forth in greater detail below, your affiant and members of the investigative team believe that GROSS is assisted by Target Subject #2 and others in the distribution of drugs. Investigators are aware that GROSS does not have a primary residence and typically stays at three different residences, which investigators are aware is common for drug traffickers.

---

[2] The Confidential Source (CS) is a documented Baltimore City confidential source. The CS is cooperating for judicial leniency for a recent firearms-possession charge. The CS has a criminal history that includes arrests and/or convictions for narcotics and firearms violations. The CS' information has been shown to be reliable in this investigation and the information provided by the CS pertaining to this investigation has been corroborated. No information has been derived by DEA that would indicate that CS is providing false information in any manner.

21. Based on training and experience, your affiant is aware that drug traffickers commonly use several different residences to store narcotics and money in the event that they are caught by law enforcement so that everything is not stored at only one location.

22. Your affiant and members of the investigative team are also aware that GROSS provided a Rosedale, Maryland address as his primary residence to federal probation and parole. Through electronic and physical surveillance, investigators have been able to determine that GROSS never stays at the aforementioned residence and are aware that it is common for narcotics traffickers to provide false information to law enforcement in order to be able to continue to conduct narcotics related business.

23. Additionally, GROSS' primary vehicle is a black Infiniti SUV bearing MD registration 7GD-4132 ("Target Vehicle"). Your affiant received federal court authorization for a GPS tracking device on the Target Vehicle on March 27, 2025, and received authorization for an extension to continue to monitor GPS location information for the Target Vehicle on May 2, 2025.

24. On December 19, 2024, at approximately 9:30 am, precision location information associated with the cellular telephone number utilized by GROSS placed the device in the area of Key Highway and Lawrence Street in the Baltimore area. Members of DEA Baltimore Group 54 established physical surveillance in the area of Key Highway and Lawrence Street in an attempt to conduct surveillance of GROSS. At approximately 11:15 am, investigators observed a blue Toyota Camry bearing MD registration 5GG-1485 (registered to All Car Leasing and rented by GROSS) departed from the area of 200 Harborview Drive in Baltimore, Maryland. Investigators observed a black male driving the vehicle and were unable to tell if GROSS was the driver of the Toyota Camry. The vehicle departed the area on Key Highway and investigators remained in the

area in the event that GROSS was not driving the Target Vehicle. At approximately 11:40 am, precision location information associated with the cellular telephone number utilized by Gross placed the device in the area of W. Mount Royal Avenue in Baltimore, MD.  Since the GPS Location data associated with the cellular telephone used by GROSS moved from the area of 200 Harborview Drive, investigators believed that GROSS was driving the vehicle. Shortly thereafter, physical surveillance was terminated.

25. During the week of March 10, 2025, your affiant spoke with management at the Harborview Condo building regarding GROSS and management advised your affiant that GROSS was currently renting 100 Harborview Drive, Unit 209, Baltimore, Maryland, and began renting the condo on October 10, 2024. Management also provided your affiant with a copy of the lease that GROSS signed which showed that his name was on the lease for the aforementioned condo.

26. On March 12, 2025, your affiant provided management of the Harborview condo building with a subpoena to obtain key fob information to determine when GROSS visits the apartment building as well as to view security footage of GROSS entering and exiting the building. The key fob information showed that GROSS visited the building only for brief periods and typically only remained at the building for a few hours at a time.

27. Investigators are aware that it is typical for narcotics traffickers to maintain stash house locations separate from their primary residence and only use stash house locations for short, sporadic periods.

28. GROSS typically arrived at the building during the early hours of the morning or during the middle of the day and only stayed for one to two hours.

29.     Investigators reviewed surveillance footage of GROSS visiting 100 Harborview Drive for short periods of time on multiple occasions in March 2025. Investigators saw that on March 1, 2025, GROSS entered the building and got onto the elevator at approximately 1:07 A.M. empty-handed. GROSS then left the elevator on the second floor and walked in the direction of Unit 209. At approximately 10:48 am, GROSS got back onto the elevator on the second floor carrying a white laundry-style bag. GROSS then took the elevator down to the lobby and left the building.

30.     On March 6, 2025, GROSS entered the building at approximately 6:18 A.M. and entered the elevator carrying a tan bag, two white bags, and a black bag. GROSS took the elevator to the second floor where GROSS exited the elevator and walked in the direction of Unit 209. At approximately 7:50 A.M., GROSS returned to the elevator on the second floor with a black suitcase, took the elevator down to the lobby, and left the building.

31.     On March 10, 2025, GROSS entered the building at approximately 7:07 A.M. and entered the elevator with a small black suitcase. GROSS took the elevator to the second floor and got off the elevator walking towards Unit 209. At approximately 9:21 A.M., GROSS returned to the elevator from the second floor carrying a small black bag. GROSS then took the elevator to the lobby and left the building.

32.     Based on the review of the surveillance footage and training and experience, investigators believe that GROSS is using Unit 209 on 100 Harborview Drive as a stash house location for narcotics and/or proceeds of his narcotics trafficking. More specifically, GROSS has been observed coming and going from Unit 209 at different times of day and is typically carrying bags or a suitcase, which can be utilized to transport narcotics and/or U.S. Currency. Investigators are also aware that GROSS is not using Unit 209 as a primary residence and is

paying approximately $2,334 per month for the unit only to utilize the unit for a few hours at a time.

33. On April 3, 2025, your affiant again conducted a review of surveillance footage at 100 Harborview Drive in Baltimore, MD and observed GROSS on March 28, 2025, entering the elevator at approximately 12:33 A.M. carrying a large grey duffle bag. GROSS then left the elevator on the second floor and walked in the direction of Unit 209. At approximately 9:03 am, GROSS returned to the elevator on the second floor carrying the same large grey duffle bag. GROSS then took the elevator down to the lobby and left the building.

34. On March 29, 2025, surveillance shows that GROSS is entered the elevator at approximately 10:20 A.M. carrying a large grey duffle bag. GROSS left the elevator on the second floor and walked in the direction of Unit 209. At approximately 12:10 P.M., GROSS returned to the elevator on the second floor carrying the same large grey duffle bag. GROSS took the elevator down to the lobby and GROSS left the building shortly thereafter.

35. Based on training and experience, investigators believe that GROSS is using the large grey duffle bag to transport both money and narcotics to and from Unit 209 on 100 Harborview Drive.

36. On April 8, 2025, surveillance showed that at approximately 10:33 A.M., GROSS entered the elevator at 100 Harborview Drive from the lobby carrying a large black duffle bag and a white and black bag. GROSS then exited the elevator on the second floor and walked in the direction of Unit 209.  At approximately 11:51 A.M., GROSS returned to the elevator on the second floor carrying the same large black duffle bag. GROSS exited the elevator at the lobby and left from the building.

37.     On this same date, GROSS entered the elevator at 100 Harborview Drive at approximately 11:22 P.M. carrying a white plastic bag. GROSS then exited the elevator on the second floor and walked in the direction of Unit 209. GROSS remained at the condo overnight and departed on April 9, 2025, at approximately 10:25 A.M. carrying a white plastic bag.

38.     I believe that GROSS used the large black duffle bag to transport large quantities of narcotics and U.S. Currency to and from the condo.

39.     On April 23, 2025, at approximately 9:24 P.M., surveillance showed GROSS entering the elevator at 100 Harborview Drive carrying a tan grocery bag as he took the elevator from the garage up to the second floor. GROSS then exited the elevator on the second floor and walked towards Unit 209.

40.     On April 24, 2025, at approximately 9:43 A.M., surveillance at 100 Harborview Drive showed GROSS entering the elevator from the second floor carrying a large grey duffle bag. GROSS then took the elevator down to the lobby and left the building. GPS tracking data associated with GROSS' vehicle showed that the Target Vehicle departed from the condo building and went straight to LA Fitness which is located at 10040 Reisterstown Road, Owings Mills, MD 21117, arriving at approximately 10:30 A.M. Additionally, your affiant arrived in the area of 10040 Reisterstown Road at approximately 10:55 A.M. and observed GROSS' vehicle parked in the area of the LA Fitness. Investigators then replaced the GPS tracking device on the Target Vehicle with a fully charged GPS tracking device. At approximately 11:00 A.M., your affiant and members of the investigative team departed the area and continued to monitor the GPS location data associated with the tracking device on vehicle. At approximately 12:45 pm, GPS location data showed that the vehicle departed from the area of LA Fitness and traveled onto Reisterstown Road.

41.     At approximately 1:25 P.M., GPS location data showed that the vehicle was briefly in the area of Edgecombe Circle in Baltimore, MD. Investigators are aware that this area is where GROSS typically does narcotics-related business and observed GROSS' vehicle parked in the rear of a suspected stash house utilized by GROSS.

42.     On April 29, 2025, at approximately 10:36 P.M., surveillance footage from 100 Harborview Drive showed GROSS entering the elevator carrying a grey duffle bag. GROSS exited the elevator on the second floor and walked in the direction of Unit 209. On April 30, 2025, at approximately 9:50 A.M., GROSS entered the elevator from the second floor, took the elevator down to the lobby and left the building.

43.     On May 1, 2025, at approximately 5:00 P.M., surveillance footage from 100 Harborview Drive showed GROSS entering the elevator with Target Subject #2. GROSS and Target Subject #2 exit the elevator on the second floor and walk towards Unit 209. At approximately 5:32 P.M., GROSS and Target Subject #2 entered the elevator on the second floor and then leave the building.

44.     Based on the information provided by the CS, investigators believe that GROSS and Target Subject #2 were inside of Unit 209 for such a brief period of time for the sole purpose of conducting narcotics-related business prior to departing 100 Harborview Drive. Your affiant has typically observed GROSS at Unite 209 on 100 Harborview Drive by himself and believes that only those involved in assisting GROSS with narcotics distribution would know about 100 Harborview Drive Unit 209.

45.     On May 2, 2025, at approximately 8:10 A.M., 100 Harborview Drive surveillance footage showed GROSS entering the elevator carrying a grey duffle bag. GROSS exited the

elevator on the second floor and walked towards Unit 209. At approximately 8:51 A.M., GROSS returned to the elevator carrying a grey duffle bag and left the building.

46. On May 7, 2025, at approximately 9:51 pm, surveillance footage from 100 Harborview Drive showed GROSS entering the elevator carrying a grey duffle bag. GROSS took the elevator to the second floor and exited the elevator walking in the direction of Unit 209. On May 7, 2025, investigators were conducting physical and electronic surveillance of GROSS and prior to GROSS arriving at Unit 209, GROSS and Target Subject #2 were observed leaving from a possible stash house at approximately 8:16 P.M., with GROSS carrying the large grey duffle bag. Investigators believe that GROSS was transporting a large quantity of narcotics from the stash house to Unit 209 on 100 Harborview Drive.

47. On May 8, 2025, at approximately 10:43 A.M., 100 Harborview Drive surveillance footage showed GROSS getting onto the elevator empty-handed and taking the elevator to the second floor where he left the elevator and walked in the direction of Unit 209. At approximately 11:55 A.M., GROSS returned to the elevator from the second floor carrying a large grey duffle bag and left the building shortly thereafter.

48. Based on training and experience, law enforcement believe that GROSS is using the large grey duffle bag to transport large quantities of U.S. Currency and narcotics and is doing so at all different times of the day as described in further detail above.

49. On May 29, 2025, the Honorable J. Mark Coulson signed a federal sneak and peek search warrant for 100 Harborview Drive, Unit 209, Baltimore, Maryland. On June 2, 2025, at approximately 8:00 A.M., members of DEA Baltimore Group 54 established surveillance in the area 100 Harborview Drive, Baltimore, Maryland. At approximately 8:15 A.M., GPS location information associated with the Target Vehicle showed that the vehicle arrived and

parked in the area of 100 Harborview Drive, Baltimore, Maryland. Law enforcement observed GROSS entering the building at approximately 8:22 A.M. empty-handed and departing departed from the building at approximately 9:19 A.M. carrying a grey duffle bag.

50.     At approximately 9:35 A.M., law enforcement knocked on the door of Unit 209 on 100 Harborview Drive several times to ensure that no one was inside of the apartment. Your affiant then used the key voluntarily provided by management to enter the condo. During the search of the apartment, investigators found a locked green bank bag in the closet, concealed within a larger shopping bag. The green bank bag was heavy and felt like it contained a large amount of U.S. Currency.  Investigators were unable to open the bag as it was locked and did not want to cut open the bag as it would compromise the investigation. Investigators limited the search due to concern about leaving evidence of their presence, but did not find anything else of evidentiary value. Law enforcement took photographs of the bag and investigators departed from the apartment at approximately 10:07 A.M.

51.     GPS Data of the Target Vehicle showed investigators that GROSS routinely stays at three different residences at the end of the night, with no established primary residence. Your affiant knows it to be common for individuals to store evidence of drug trafficking in several different residences, such as ledgers and more U.S. Currency in order to not have everything in one location in the event that law enforcement conducts searches and/or arrests. Furthermore, your Affiant believes that GROSS is utilizing the different locations, including 100 Harborview Drive, Unit 209, Baltimore, Maryland to store his supply of drugs, maintain financial records and financial instruments related to their narcotics transactions and the profits derived from those transactions. Your Affiant knows based on his training, knowledge and experience that drug

traffickers will typically maintain financial records, instruments and profits in different residences to prevent law enforcement from seizing everything in the event that they are arrested.

52. On June 12, 2025, the Honorable Douglas R. Miller, United States Magistrate Judge, issued a search and seizure warrant for 100 Harborview Drive, Unit 209, Baltimore, Maryland.  On June 16, 2025, law enforcement executed the warrant on 100 Harborview Drive, Unit 209, Baltimore, Maryland. After announcing themselves as law enforcement at the door and waiting for a reply, law enforcement forced the door open.  Once inside, law enforcement discovered the condo was unoccupied.  During the execution of the search warrant, law enforcement seized a medium size shopping bag containing a dark colored locked money bag containing U.S. currency from the master bedroom closet, as well as a small black tote bag containing U.S. currency in the master bedroom closet.  The Defendant property consists of these two amounts of U.S. currency. Law enforcement also found a personal planner in the condo as well as numerous other documents. Nothing else of note was found at 100 Harborview Drive Unit 209.

53. On June 16, 2025, law enforcement also executed a warrant for GROSS, also issued by the Honorable Douglas R. Miller, United States Magistrate Judge, on June 12, 2025. After law enforcement served the warrant on GROSS and read him his Miranda Rights, GROSS told law enforcement that he sold marijuana.

54. GROSS meets the indicia of drug trafficking in a variety of ways, including but not limited to: having a history of drug trafficking, admitting to law enforcement that he sold marijuana, and renting a residence where he does not reside but visits sporadically for only brief periods of time.  Because GROSS appears to be trafficking drugs and appears to have no other source of legitimate income, the Defendant Property - a large amount of currency seized from

GROSS' rental property - is more likely than not a "thing of value" furnished or intended to be furnished in an illicit drug transaction, or proceeds from such an exchange

## Conclusion

55. Based on the foregoing facts and my training and experience, I maintain that the Defendant Property constitutes: (1) "things of value" furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; or (2) proceeds traceable to such an exchange, and thus is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 25th day of November, 2025.

_____
Michael Carnucci
Special Agent
Drug Enforcement Administration